WO                                                                                          JL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

Benjamin Freeman,                          No.  CV 18-01015-PHX-JAT (MHB)

                    Plaintiff,

v.                                         **ORDER**

State of Arizona, et al.,

                    Defendants.

　　　　Following the Ninth Circuit Court of Appeals' decision vacating the Court's October 31, 2018 Order dismissing this case and remanding the case to this Court, in a July 9, 2020 Order, the Court gave Plaintiff 30 days to file a fourth amended complaint.  Plaintiff subsequently requested and received an extension of time.  On August 20, 2020, Plaintiff filed a Fourth Amended Complaint (Doc. 39).  On September 3, 2020, Plaintiff filed a Motion to Strike and Replace (Doc. 40) and lodged a proposed revised Fourth Amended Complaint (Doc. 41).   The Court will deny the Motion to Strike and Replace; order Defendants Keefe, Lopez, Reyes, Barraza, Westfall, and Corral to answer Count Three of the August 20, 2020 Fourth Amended Complaint; and dismiss the remaining claims and Defendants without prejudice.

**I.     Motion to Strike and Replace**

　　　　In his Motion, Plaintiff requests to strike his Fourth Amended Complaint and replace it with a revised Fourth Amended Complaint.  Plaintiff's lodged proposed Fourth

Amended Complaint exceeds the 21-page limit for prisoner civil rights complaints and therefore does not comply with the Local Rules of Civil Procedure. *See* LRCiv 3.4 ("All complaints . . . by incarcerated persons must be signed and legibly written or typewritten on forms approved by the Court and in accordance with the instructions provided with the forms."); Form Instructions ¶ 2 ("If needed, you may attach additional pages, **but no more than fifteen additional pages**, of standard letter-sized paper.")  The Court will therefore deny the Motion to Strike and Replace and will screen the Fourth Amended Complaint filed on August 20, 2020.

## II.   Statutory Screening of Prisoner Complaints

The Court is required to screen complaints brought by prisoners seeking relief against a governmental entity or an officer or an employee of a governmental entity.  28 U.S.C. § 1915A(a).  The Court must dismiss a complaint or portion thereof if a plaintiff has raised claims that are legally frivolous or malicious, that fail to state a claim upon which relief may be granted, or that seek monetary relief from a defendant who is immune from such relief.  28 U.S.C. § 1915A(b)(1)–(2).

A pleading must contain a "short and plain statement of the claim *showing* that the pleader is entitled to relief."  Fed. R. Civ. P. 8(a)(2) (emphasis added).  While Rule 8 does not demand detailed factual allegations, "it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."  *Id.*

"[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Id.* (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Determining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."  *Id.* at 679.  Thus, although a plaintiff's specific factual

allegations may be consistent with a constitutional claim, a court must assess whether there are other "more likely explanations" for a defendant's conduct. *Id.* at 681.

But as the United States Court of Appeals for the Ninth Circuit has instructed, courts must "continue to construe *pro se* filings liberally." *Hebbe v. Pliler*, 627 F.3d 338, 342 (9th Cir. 2010). A "complaint [filed by a pro se prisoner] 'must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Id.* (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam)).

## III. Fourth Amended Complaint

In his three-count Fourth Amended Complaint, Plaintiff seeks monetary relief from former Arizona Department of Corrections (ADC) Director Charles L. Ryan; current ADC Director David Shinn; Lieutenant Keefe; Sergeants Frame and Dayton; Correctional Officers (COs) II Lopez, Ponzchoch, Van, Gorham, and Corral; CO III Reyes; COs IV Westfall, Barraza, Garza, and Brookheart; ADC Legal Counsel Julia Erwin; Nurses Cromer and Olds; and Dr. Shute. Plaintiff asserts claims related to his medical care, denial of access to the courts, retaliation, and a threat to his safety.

In **Count One**, Plaintiff alleges that "ADC/Corizon appears to have a custom and policy" that in order to discontinue a medication, a prisoner must sign a treatment refusal form three times. Plaintiff asserts that he followed this custom and practice of refusal of medication.

Plaintiff alleges that in August 2017, he was prescribed Aricept "keep on person" (KOP) for cognitive impairment. Plaintiff was given a 30 day supply to be taken once per day as prescribed. In October 2017, Defendant Cromer informed Plaintiff that he had to come to morning medications to take Aricept, although Plaintiff had already taken Aricept in his cell. Defendant Cromer informed Plaintiff that Aricept was no longer being given KOP because the Corizon pharmacy had changed the KOP status of Aricept to "watch [and] swallow." Plaintiff told Defendant Cromer that he is 65 years old and did not feel like walking down to morning medications each morning because of the pain, tingling, and numbness in his feet. Plaintiff "instruct[ed]" Defendant Cromer that if the only way he

could take Aricept was through "watch and swallow," then he did not want to take the medication.

Defendants Cromer and Ponzchoch told Plaintiff that the unit nurse, Defendant Olds had to remove Plaintiff's name from Corizon's computer database in order to discontinue Aricept.  Plaintiff "continued to receive" Aricept each month because Defendant Olds never changed the prescription from KOP to watch and swallow, while Defendants Cromer and Ponzchoch called Plaintiff to morning medications to take a second dose of Aricept. Plaintiff contends Defendant Cromer recklessly disregarded the fact that Plaintiff had been prescribed Aricept to be taken only once per day when Cromer instructed Defendant Ponzchoch to call Plaintiff to take a second dose of Aricept.  Plaintiff claims Defendant Cromer knew that a second dose of Aricept would be harmful to Plaintiff "over a period of time" and that Cromer "had reason to know," as a pill call nurse, that her conduct created an unreasonable risk of harm to Plaintiff.

In November 2017, Plaintiff was transferred to Manzanita Unit.  There, the same "customs and practices" relating to Aricept were in effect.  In December 2017, Plaintiff was transferred back to Santa Rita Unit.  Plaintiff alleges that it is a "custom" of Santa Rita's medical unit that after a doctor, physician's assistant, or nurse's assistant prescribes or treats a prisoner, "this information is then provided" to the unit nurse—in this case, Defendant Olds—for distribution to the pharmacy and recordkeeping.

In February 2018, Defendant Shute examined and tested Plaintiff to determine if he had cognitive impairment or Alzheimer's and whether he should continue to take Aricept. Defendant Shute determined that Plaintiff was not cognitively impaired and did not have Alzheimer's.  Plaintiff alleges it was Defendant Olds's "duty" to enter Defendant Shute's medical orders and findings into Corizon's database and remove Plaintiff's name from Corizon's pharmacy list "to immediately stop" the Aricept prescription.  Plaintiff claims that Defendant Olds did not remove his name from Corizon's pharmacy for six months after Plaintiff signed a medical refusal.  Plaintiff contends that Defendant Olds acted with deliberate indifference by failing to remove Plaintiff's name from Corizon's pharmacy list

and enter Defendant Shute's "order" that Plaintiff did not need Aricept.  Plaintiff alleges this delay caused him pain and suffering because he had to "walk with pain in his feet to take unwanted Aricept."

On March 28, 2018, Defendant Ponzchoch "forced" Plaintiff to take a second dose of Aricept that Plaintiff "clearly did not want" by threatening disciplinary sanction. Plaintiff refused to sign for or take the Aricept, and Defendant Ponzchoch issued a disciplinary ticket.  The same day, Plaintiff "observed" Defendant Cromer changing Plaintiff's medical records.

Plaintiff claims Defendant Ponzchoch knew Plaintiff had taken a dose of Aricept each morning but dispatched a CO II to Plaintiff's cell to inform Plaintiff that he needed to take another dose.  Plaintiff alleges that "[t]his was known" to Defendant Ponzchoch for more than five months because Plaintiff "would inform the COs" that he had taken a dose of Aricept in the morning, that he did not need a second dose, and that his feet hurt.  Plaintiff also informed the COs II that the instructions on the Aricept bottle state, "Do not exceed the recommended dose, or change your dose."

Plaintiff claims that the COs II used their radios to inform Defendant Ponzchoch of Plaintiff's refusal to take a second dose of Aricept.  Defendant Ponzchoch told the COs II that if Plaintiff did not go to medical, the COs II were to give him a disciplinary ticket. Defendant Ponzchoch knew Plaintiff had signed treatment refusal forms because Ponzchoch is responsible for distributing medical refusal forms to prisoners who refuse medications.  To sign medical refusal forms, a prisoner must either sign a medical refusal form at the security desk window, where Defendant Ponzchoch "sits."  Plaintiff alleges that when he signed a refusal form, he passed it back to Defendant Ponzchoch who checked the signature.

Plaintiff asserts that Defendant Ponzchoch knew a second dose was dangerous, that Plaintiff had signed refusal forms, and that Defendant Shute had determined that Plaintiff was not cognitively impaired and did not have Alzheimer's.  Plaintiff claims that Defendant Ponzchoch nevertheless forced him to take two doses of Aricept "off and on" for six

months.  Plaintiff contends that Defendant Ponzchoch is a correctional officer, not a treating physician, and has worked in her security position "for a good number of years." Plaintiff contends that Defendant Ponzchoch "knows everything that goes on" in Santa Rita Unit's medical facility because she is in close contact with nurses and doctors, who "keep her informed" about prisoners, their medical conditions, and the medications they are taking.  Plaintiff alleges that Defendant Ponzchoch "does what medical providers instruct her to do."

In **Count Two**, Plaintiff alleges that on July 23, 2014, the court in his criminal proceeding appointed a private investigator, non-party James Williams, to assist Plaintiff. Plaintiff asked Williams to obtain Plaintiff's co-defendant's plea agreement, but Williams never provided the plea agreement.

In 2017, the Office of Public Defense Services appointed a new private investigator, non-party Kelly Townsend, to assist Plaintiff in preparing and researching a petition for post-conviction relief.   In January 2018, Plaintiff requested that Townsend obtain information relating to his co-defendant's plea agreement.  Townsend informed Plaintiff that he had located the "requested relevant documents."  On March 6, 2018, Defendant Garza gave Plaintiff an Inmate Property Contraband form, informing Plaintiff that an envelope from Townsend containing paperwork "on another inmate" had been seized.

On March 6, 2018, Plaintiff received a Notice to Sender of Rejection of Incoming Mail.  The same day, Plaintiff wrote to Defendant Dayton and explained that the confiscated letter contained court documents from his private investigator relating to his Rule 32 proceeding and that his deadline to file a petition was March 5, 2018.  On March 8, 2018, Defendant Frame responded on behalf of Defendant Dayton, stating that "[a]fter following up with the Department's legal counsel, it was determined you may receive all documentation in the contrabanded envelope with the exception of the former inmate[']s . . . data base sheet."  Defendant Frame stated that this information was forwarded to the contraband officer and the envelope should be forwarded to Plaintiff within one day.

Defendants Garza, Frame, and Dayton never provided the contrabanded legal documents to Plaintiff.

Plaintiff asked Townsend to send him another copy of the plea agreement, but "he stated" that Defendant Frame would "steal it" from the mail again.  Townsend had planned a trip to Tucson and told Plaintiff he would bring the plea agreement with him, but the trip to Tucson fell through.

On March 13, 2018, Plaintiff submitted an Inmate Informal to Defendant Gorham, stating that he had only one chance of being released from prison through a Rule 32 proceeding that had been due on March 5, 2018.  On March 30, 2018, the trial court in Plaintiff's criminal proceeding granted an extension of time for filing a petition for post-conviction relief, but Defendants "continued to possess" Plaintiff's co-defendant's plea agreement, order of confinement, and sentence of imprisonment.   On April 3, 2018, Defendant Gorham responded to Plaintiff's Informal Complaint, stating that he had spoken to Defendant Dayton and that Dayton had told Gorham that he had not "had contact" with Plaintiff's mail.  Defendant Gorham also wrote that he was unable to verify that Plaintiff's legal mail was "handled outside of policy."  Plaintiff alleges that Defendant Gorham failed to contact Defendants Frame and Garza or ADC's legal counsel (presumably, Defendant Erwin).

On April 12, 2018, Plaintiff's private investigator, Townsend, filed a Notice of Compliance in the trial court, stating that ADC was not providing Townsend's mailings to Plaintiff and instead was disposing of the contends, despite "Legal Mail" being written "all over the envelope."  On June 6, 2018, Plaintiff filed a petition for post-conviction relief, in which Plaintiff argued that his first private investigator, Williams, had provided inadequate investigative services because Williams failed to obtain Plaintiff's co-defendant's plea agreement.  On August 30, 2018, the trial court dismissed Plaintiff's Rule 32 proceeding, before Plaintiff could obtain his co-defendant's plea agreement "to add as a claim for relief."  Plaintiff alleges that during his Rule 32 proceeding, he requested and was granted 17 requests for extensions of time, "most while waiting for" the plea agreement.  Plaintiff

could not file the contrabanded and seized plea agreement that was in the possession of Tucson Complex's Mail and Property Officers.

Plaintiff contends his co-defendant's plea agreement was necessary to include in his Rule 32 petition because his co-defendant "committed the crimes," but Plaintiff was "charged with the same crimes he did not commit." Plaintiff discovered when he eventually received a copy of the plea agreement in September 2018 that his co-defendant's plea agreement was for nine months in prison. Plaintiff claims that he went to trial and was convicted and sentenced to 25 years for crimes he did not commit. Plaintiff also needed the plea agreement because he believed his co-defendant had been on probation at the time of the crimes she committed but only received a nine-month sentence and was released after only a few weeks in prison, and if that was the case, then Plaintiff "should have also been able to do the same or similarly." Plaintiff also believes his co-defendant received a better plea because Plaintiff is a Black man, and his co-defendant is a white woman. In addition, Plaintiff believes that because the arresting police officers, the lawyers, the judges, and the jurors in Plaintiff's case were all white, Plaintiff received more prison time and was "shafted by an accumulation of racism, bias and prejudice."

Plaintiff's co-defendant signed her plea agreement on January 13, 2014, while Plaintiff was represented by counsel and preparing for trial. Plaintiff asserts that had he known that his co-defendant had been offered and signed a plea agreement for nine months in prison, he would not have "acted so foolishly and chose[n] trial." Plaintiff believes that if Williams had provided Plaintiff with a copy of the co-defendant's plea agreement before Plaintiff chose to go to trial, the outcome of the trial would have been different, because "there would have been no trial."

Plaintiff alleges that Defendants Frame and Dayton violated Plaintiff's right to access the courts when they confiscated Plaintiff's co-defendant's plea agreement, order of confinement, and sentence of imprisonment. Plaintiff asserts that Defendants Frame and Dayton intentionally deceived him when they claimed that ADC's legal counsel had determined that Plaintiff could receive all documentation in the contrabanded envelope,

with the exception of the former inmate's data sheet, but Frame and Dayton never provided those documents to Plaintiff.  Plaintiff asserts this "eliminated" his capability of bringing a "contemplated" challenge to his sentence in a Rule 32 post-conviction-relief proceeding. He claims he was unable to conduct any additional research and investigation for his contemplated challenge because he could no longer instruct his private investigator to find out why certain counts had been dismissed and why his co-defendant's probation reports and medical and psychological records had been sealed.  Plaintiff contends this information would have been helpful to his case.

In **Count Three**, Plaintiff alleges that Defendant Keefe incited Plaintiff's cellmate to commit violence against Plaintiff because Plaintiff had filed grievances "against" the Interracial Housing Program for making Black prisoners cell together, that is, segregating Black prisoners in an interracial prison unit.  When Plaintiff was first confined in the Santa Rita Unit in April 2017, he was housed with a Mexican prisoner for about three weeks. Shortly thereafter, another prisoner, "Cal" who was a long-time friend of Defendant Van, entered the Santa Rita Unit.  Cal "instructed" Defendant Van to place him in a cell with a quiet old Black man.  Defendant Van reviewed the Inmate Movement Board at night, when Defendant Lopez, the movement officer, was not present.  Defendant Van saw that Plaintiff "fit[]" Cal's "demands."  Defendant Van "bump[ed]" Plaintiff's cellmate out of the cell so that Cal could house with Plaintiff, despite Cal's mental health and "psyche" issues. Plaintiff contends Defendant Van placed Cal in Plaintiff's cell without consultation with mental health professionals concerning any prior psychiatric history.

Plaintiff asserts that Defendant Van violated the Court's Order in *Rudisill v. Ryan*, CV 13-01149-TUC-CKJ,[1] which he claims mandated prisoner desegregation in housing units.  Cal was not classified as "R.O.," or "Restricted to Own," meaning that the prisoner can only house with a member of his same race.

---

[1] The parties stipulated to settle the case and the stipulation applied to the Douglas, Eyman, Florence, Lewis, Perryville, Phoenix, Safford Tucson, Winslow, and Yuma complexes.  *Rudisill*, No. 13-01149, Doc. 119.  Under the stipulation, the defendants did not admit liability but agreed to develop and instate policies, practices, and procedures to implement an Integrated Housing Program (IHP).  *Id.*

Plaintiff claims Defendant Keefe retaliated against Plaintiff because, on October 26, 2017, he filed an Informal Complaint to CO III Michoff requesting to be moved to yard 4. Plaintiff stated in the Informal Complaint that he had spoken to Defendants Lopez and Keefe concerning Cal's refusal to take his morning medications for his psychiatric issues, his violent tendencies, and because he "shoves his employment duties" as a recreation aide onto Plaintiff so that Cal can gamble.   The same day, Defendants Reyes and Lopez informed Plaintiff and Cal that they had to move from yard 2 to yard 4.   Cal was "very upset" because he would lose his prison job and education status if he moved to a new yard. Plaintiff immediately began moving, but Cal was "hesitant and slow."   Cal asked a CO III to speak with Defendants Keefe and Lopez because he did not want to be moved.   Plaintiff alleges that Defendants Keefe, Reyes, and Lopez "informed Cal of every word" that Plaintiff had confidentially written and verbally stated in his grievances and personal communications with them.   Plaintiff claims this briefing was intentional and incited Cal to perpetuate violence against Plaintiff, although Defendants knew that Cal and Plaintiff would occupy a two-man cell on yard 4 and that Defendants' "Official Reports" to Cal would cause "[fisticuffs]."   Plaintiff contends Defendant Keefe's actions were intended to hinder and discourage Plaintiff from exercising his First Amendment right to file grievances.   Plaintiff asserts that Defendant Keefe, Reyes, and Lopez's actions chilled Plaintiff's First Amendment right to file grievances and "led to Plaintiff being assaulted." Plaintiff further claims Defendant Keefe's actions did not advance a legitimate correctional goal.

After Defendants "briefed" Cal, he entered yard 4 with Plaintiff.   The next morning, Cal did not take his morning medications and began to call Plaintiff a "snitch" for "telling on him."   Cal punched Plaintiff in the ribs; Plaintiff alleges that he "defended" himself but did not "throw any punches."   Defendant Corral entered Plaintiff's cell, and both Cal and Defendant Corral "began laughing simultaneously," either because Defendant Corral had been present when Cal was debriefed or had "heard about the briefing."   Plaintiff claims that Defendant Corral's laughter further incited Cal, and Corral, having left the cell,

permitted Cal to walk toward Plaintiff and punch him in the ribs again.  Defendant Corral stood outside the cell door and watched to ensure his supervisors "were not watching." Defendant Corral did not attempt to restrain Cal.

Defendant Corral then escorted Cal to the medical unit.  When they returned to the cell, Defendant Corral wrote disciplinary tickets for both Plaintiff and Cal.  Plaintiff alleges that Cal falsely claimed that Plaintiff had "agitated" the fight.   Plaintiff claims that Defendant Corral's "false testimony" in the disciplinary ticket was made "in conjunction with" Defendant Keefe's retaliation against Plaintiff.

Defendants Barraza and Westfall and non-party Captain Ponzette conducted a disciplinary hearing.  Plaintiff stated that Cal was "stealing inmates['] ice" for his personal use and that Cal had placed a "hit" on Plaintiff.  Plaintiff was found guilty at the disciplinary hearing and then was transferred to the Manzanita Unit as retaliation.

During the disciplinary hearing, Defendants Barraza and Westfall used their two-way radios to "broadcast" Plaintiff's confidential disciplinary hearing to "H.U. #2" to inform the COs and all prisoners standing by or near the COs that Plaintiff had said Cal was stealing prisoners' ice for his personal use.  Plaintiff asserts that he "knows this" the hearing was transmitted because the following day, non-party CO II Lynch informed Plaintiff that Lynch had heard Defendants Barraza and Westfall's radio transmissions at Plaintiff's disciplinary hearing.  Lynch stated that she was at "Complex," which is not on Santa Rita Unit, when she heard the two-way radio transmissions.

When Plaintiff entered the Manzanita Unit, prisoners "knew of the events" that had occurred at the Santa Rita Unit and threatened Plaintiff because of what Plaintiff had stated in his grievances about Cal and because Plaintiff had "snitch[ed] on" Cal for stealing ice.

Plaintiff alleges that Defendants Westfall and Barraza knew other prisoners could hear what was said on their two-way radios because the radios are always on their person for safety and security purposes, and Defendants are "always in contact" with prisoners. Plaintiff asserts Defendants knew Plaintiff was in danger of being harmed because Plaintiff

informed them that Cal had placed a "hit" on Plaintiff, but Defendants disregarded an excessive risk to Plaintiff's safety.

Plaintiff contends that Defendants Ryan and Shinn failed to follow the IHP policy regarding the integration and desegregation of prisoners in the IHP. Plaintiff alleges that white prisoners can "choose their white cellmates" but staff and administration force Black prisoners to live together. Plaintiff asserts that Defendants Ryan and Shinn failed to enforce integration and desegregation policies in Santa Rita Unit and Manzanita Unit.

**IV.    Discussion of Fourth Amended Complaint**

Although pro se pleadings are liberally construed, *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), conclusory and vague allegations will not support a cause of action. *Ivey v. Bd. of Regents*, 673 F.2d 266, 268 (9th Cir. 1982). Further, a liberal interpretation of a civil rights complaint may not supply essential elements of the claim that were not initially pled. *Id.*

**A.    Defendants Ryan and Shinn**

To state a valid claim under § 1983, plaintiffs must allege that they suffered a specific injury as a result of specific conduct of a defendant and show an affirmative link between the injury and the conduct of that defendant. *See Rizzo v. Goode*, 423 U.S. 362, 371-72, 377 (1976). There is no respondeat superior liability under § 1983, and therefore, a defendant's position as the supervisor of persons who allegedly violated Plaintiff's constitutional rights does not impose liability. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978); *Hamilton v. Endell*, 981 F.2d 1062, 1067 (9th Cir. 1992); *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989). "Because vicarious liability is inapplicable to *Bivens* and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676.

Plaintiff has not alleged that Defendants Ryan and Shinn personally participated in a deprivation of Plaintiff's constitutional rights, were aware of a deprivation and failed to act, or formed policies that resulted in Plaintiff's injuries. Rather, Plaintiff names Ryan

and Shinn solely based on their positions as ADC Director.  Thus, the Court will dismiss without prejudice Defendants Ryan and Shinn.

### B.    Defendants Brookheart and Erwin

Plaintiff does not connect any of the allegations in the Fourth Amended Complaint to Defendants Brookheart.  Plaintiff also does not specifically connect any of the allegations to Defendant Erwin. Although Plaintiff refers to ADC's "legal counsel," his only allegation is that ADC's counsel apparently determined that Plaintiff could receive all documentation in the contrabanded envelope, with the exception of the former inmate's data sheet.  This bare allegation is insufficient to support a conclusion that any of Defendant Erwin's conduct resulted in any of Plaintiff's alleged injuries.  Accordingly, the Court will dismiss Defendants Brookheart and Erwin.

### C.    Medical Care

Not every claim by a prisoner relating to inadequate medical treatment states a violation of the Eighth Amendment.  To state a § 1983 medical claim, a plaintiff must show (1) a "serious medical need" by demonstrating that failure to treat the condition could result in further significant injury or the unnecessary and wanton infliction of pain and (2) the defendant's response was deliberately indifferent.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).

"Deliberate indifference is a high legal standard."  *Toguchi v. Chung*, 391 F.3d 1051, 1060 (9th Cir. 2004).  To act with deliberate indifference, a prison official must both know of and disregard an excessive risk to inmate health; "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). Deliberate indifference in the medical context may be shown by a purposeful act or failure to respond to a prisoner's pain or possible medical need and harm caused by the indifference.  *Jett*, 439 F.3d at 1096.  Deliberate indifference may also be shown when a prison official intentionally denies, delays, or interferes with medical treatment or by the way prison doctors respond to the prisoner's medical needs. *Estelle v. Gamble*, 429 U.S.

97, 104-05 (1976); *Jett*, 439 F.3d at 1096.

Deliberate indifference is a higher standard than negligence or lack of ordinary due care for the prisoner's safety. *Farmer*, 511 U.S. at 835. "Neither negligence nor gross negligence will constitute deliberate indifference." *Clement v. Cal. Dep't of Corr.*, 220 F. Supp. 2d 1098, 1105 (N.D. Cal. 2002); *see also Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (mere claims of "indifference," "negligence," or "medical malpractice" do not support a claim under § 1983). "A difference of opinion does not amount to deliberate indifference to [a plaintiff's] serious medical needs." *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). A mere delay in medical care, without more, is insufficient to state a claim against prison officials for deliberate indifference. *See Shapley v. Nev. Bd. of State Prison Comm'rs*, 766 F.2d 404, 407 (9th Cir. 1985). The indifference must be substantial. The action must rise to a level of "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 105.

### 1.    Defendant Shute

Plaintiff's only allegation against Defendant Shute is that in February 2018, Defendant Shute examined and tested Plaintiff to determine if he had cognitive impairment or Alzheimer's and whether he should continue to take Aricept. Defendant Shute determined that Plaintiff was not cognitively impaired and did not have Alzheimer's. These allegations are insufficient to support a conclusion that Defendant Shute was aware of and disregarded a substantial risk of harm to Plaintiff or acted with deliberate indifference to such. The Court will therefore dismiss Defendant Shute.

### 2.    Defendant Olds

Plaintiff alleges that Defendant Olds did not remove Plaintiff's name from Corizon's pharmacy list for six months after Plaintiff signed the medical refusal for Aricept. Plaintiff contends that Defendant Olds acted with deliberate indifference by failing to remove Plaintiff's name from Corizon's pharmacy list and by failing to enter Defendant Shute's "order" that Plaintiff did not need Aricept. Plaintiff's allegations do not support a conclusion that Defendant Olds was aware of and disregarded a substantial risk

of harm to Plaintiff.  Plaintiff alleges only that because Olds did not timely remove Plaintiff's name from the pharmacy list, he "continued to receive" Aricept, which he had to walk sporadically to morning medications to receive.  At best, Plaintiff's allegations suggest that Olds was negligent in failing to remove Plaintiff's name from the pharmacy list.  Plaintiff has failed to state a deliberate indifference claim against Defendant Olds.  Thus, the Court will dismiss Defendant Olds.

### 3. Defendant Cromer

With respect to Defendant Cromer, Plaintiff contends Cromer recklessly disregarded the fact that Plaintiff had been prescribed Aricept to be taken only once per day when Cromer instructed Defendant Ponzchoch to call Plaintiff to take a second dose of Aricept.  Plaintiff claims Defendant Cromer knew that a second dose of Aricept would be harmful to Plaintiff "over a period of time" and that Cromer "had reason to know," as a pill call nurse, that her conduct created an unreasonable risk of harm to Plaintiff.  These vague and conclusory allegations are insufficient to support a conclusion that Defendant Cromer was aware of and disregarded a substantial risk of serious harm to Plaintiff.  Although Plaintiff alleges that he told Defendant Cromer that he did not want to take Aricept if he could not have it KOP, Plaintiff does not allege facts to support a conclusion that Defendant Cromer had any authority to override the determination that Aricept could not be prescribed KOP or to allow Plaintiff to simply not collect his prescribed dose of Aricept.  As presented, Plaintiff has not stated a deliberate indifference claim against Defendant Cromer, and this Defendant will be dismissed.

### 4. Defendant Ponzchoch

Plaintiff asserts that Defendant Ponzchoch "forced" Plaintiff to take two doses of Aricept "off and on" for six months, although Ponzchoch knew a second dose was dangerous, that Plaintiff had signed refusal forms, and that Defendant Shute had determined that Plaintiff was not cognitively impaired and did not have Alzheimer's or need to take Aricept.  However, Plaintiff does not allege facts to support a conclusion that Ponzchoch had the ability or power to remove Plaintiff's name from the Corizon pharmacy

list or disregard providers' instructions to require Plaintiff to go to pill call to take Aricept. Although Plaintiff claims Ponzchoch "forced" him to take two doses of Aricept, that is not what Plaintiff's allegations suggest.  Rather, Plaintiff's allegations indicate that Ponzchoch gave Plaintiff a choice between taking the medication or receiving a disciplinary ticket for refusing to comply with an order.  Whether or not Ponzchoch was wrong to do so, Plaintiff's allegations do not support a conclusion that Ponzchoch was aware of and disregarded a substantial risk of serious harm to Plaintiff.  Ponzchoch is not a medical provider, and Plaintiff does not allege any facts to support a conclusion that Ponzchoch knew or had reason to know that taking a second dose of Aricept was dangerous.  As presented, Plaintiff has not stated a deliberate indifference claim against Defendant Ponzchoch, and this Defendant will be dismissed.

### D.    Access to the Courts

The right of meaningful access to the courts prohibits officials from actively interfering with inmates' attempts to prepare or file legal documents.  *Lewis v. Casey*, 518 U.S. 343, 350 (1996).  The right of access to the courts is only a right to bring petitions or complaints to federal court and not a right to discover such claims or even to ligate them effectively once filed with a court.  *Id.* at 354.  The right "guarantees no particular methodology but rather the conferral of a capability–the capability of bringing contemplated challenges to sentences or conditions of confinement before the courts." *Id.* at 356.

As a matter of standing, for an access-to-courts claim, a plaintiff must show that he suffered an "actual injury" with respect to contemplated litigation.  *Id.* at 349.  To show actual injury with respect to contemplated litigation, the plaintiff must demonstrate that the defendants' conduct frustrated or impeded him from bringing to court a nonfrivolous claim that he wished to present.  *Id.* at 352-53.

"[T]he injury requirement is not satisfied by just any type of frustrated legal claim." *Id.* at 354.  The right of access to the courts "does not guarantee inmates the wherewithal to transform themselves into litigating engines capable of filing everything from

shareholder derivative actions to slip-and-fall claims." *Id*. at 355.  The nonfrivolous claim must be a direct or collateral attack on the inmate's sentence or a challenge to the conditions of his confinement.  *Id*.  "Impairment of any *other* litigating capacity is simply one of the incidental (and perfectly constitutional) consequences of conviction and incarceration." *Id*. (emphasis in original).

### 1.    Defendants Dayton and Garza

Plaintiff's allegations in Count One against Defendants Garza and Dayton are insufficient to state a claim against them.  Plaintiff alleges only that Defendant Garza gave Plaintiff an Inmate Property Contraband form, informing Plaintiff that an envelope from Townsend containing paperwork "on another inmate" had been seized.  These allegations do not support a conclusion that Garza *actively* interfered with Plaintiff's attempt to file his Rule 32 petition.  Similarly, Plaintiff claims that he wrote to Defendant Dayton regarding the confiscated letter.  Plaintiff alleges that Defendant Frame responded on behalf of Defendant Dayton; thus, it is unclear from Plaintiff's allegations whether Defendant Dayton was even aware of Plaintiff's letter.  Thus, the Court will dismiss Defendants Dayton and Garza.

### 2.    Defendants Frame and Gorham

With respect to the allegations in Count One against Defendants Frame and Gorham, Plaintiff also fails to state a claim.  Plaintiff's only alleges Gorham responded to Plaintiff's Informal Complaint, stating that he had spoken to Defendant Dayton, who told Gorham that he had no "contact" with Plaintiff's mail, and that Gorham had been unable to verify whether Plaintiff's legal mail was "handled outside of policy."  These allegations are insufficient to support a conclusion that Gorham *actively* interfered with Plaintiff's attempt to file his Rule 32 petition.

Plaintiff alleges that Defendant Frame responded to his letter to Defendant Dayton and that Frame stated that Plaintiff could receive "all documentation in the contrabanded envelope with the exception of the former inmate[']s . . . data base sheet, i.e., he could receive copies of his co-defendant's plea agreement, order of confinement, [and] sentence

of imprisonment." Plaintiff claims Defendant Frame stated that the envelope should be forwarded to Plaintiff within one day, but Plaintiff never received those documents. Plaintiff contends Defendant Frame "intentionally deceived him" when Frame claimed that ADC's legal counsel had determined that Plaintiff could receive all documentation in the contrabanded envelope, with the exception of the former inmate's data sheet, but Frame and Dayton never provided Plaintiff with those documents. However, Plaintiff's allegations do not support a conclusion that Defendant Frame had Plaintiff's documents or that Frame was personally responsible for, or knew, that Plaintiff had not received the documents. Accordingly, Plaintiff has not stated an access-to-the-courts claim against Defendants Frame and Dayton, and these Defendants will be dismissed.

### E. Retaliation

A viable claim of First Amendment retaliation contains five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights (or that the inmate suffered more than minimal harm) and (5) did not reasonably advance a legitimate correctional goal. *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005); *see also Hines v. Gomez*, 108 F.3d 265, 267 (9th Cir. 1997) (retaliation claims requires an inmate to show (1) that the prison official acted in retaliation for the exercise of a constitutionally protected right, and (2) that the action "advanced no legitimate penological interest"). The plaintiff has the burden of demonstrating that his exercise of his First Amendment rights was a substantial or motivating factor behind the defendants' conduct. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Soranno's Gasco, Inc. v. Morgan*, 874 F.2d 1310, 1314 (9th Cir. 1989).

Plaintiff alleges that, in retaliation for Plaintiff filing an Informal Complaint requesting to be moved to yard 4 because of Cal's behavior, Defendant Keefe, along with Defendants Reyes and Lopez, "informed Cal of every word" that Plaintiff had confidentially written and verbally stated about Cal in his grievances and personal

communications with them.  Plaintiff contends Defendant Keefe's actions were intended to hinder and discourage Plaintiff from exercising his First Amendment right to file grievances.  However, Plaintiff does not allege facts to support a conclusion that Defendant Keefe "briefed" Cal *because* Plaintiff had filed the Informal Complaint.  Furthermore, although Plaintiff claims Defendant Keefe's conduct chilled the exercise of his First Amendment rights, Plaintiff does not provide any facts explaining *how* the exercise of his First Amendment rights was chilled.  For example, Plaintiff does not allege that he was concerned that if he filed additional grievances, he would encounter further retaliation, or that he did not file additional grievances for that reason.  Thus, Plaintiff has not stated a retaliation claim in the Fourth Amended Complaint.

### F.    Threat to Safety

To state an Eighth Amendment threat-to-safety or failure-to-protect claim, a plaintiff must meet a two-part test.  "First, the alleged constitutional deprivation must be, objectively, sufficiently serious" such that the "official's act or omission must result in the denial of the minimal civilized measure of life's necessities."  *Farmer*, 511 U.S. at 834.  Second, the prison official must have a "sufficiently culpable state of mind," i.e., he must act with "deliberate indifference to inmate health or safety."  *Id.* (internal quotations omitted).  In defining "deliberate indifference" in this context, the Supreme Court has imposed a subjective test: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, *and* he must also draw the inference."  *Id.* at 837 (emphasis added).

Plaintiff's allegations are insufficient to state a claim against Defendant Van.  Plaintiff asserts only that Defendant Van violated the Court's Order in CV 13-01149-TUC-CKJ, which mandated prisoner desegregation in housing units.  Violation of a Court order in another case does not amount to violation of Plaintiff's constitutional rights in a separate case.  Accordingly, the Court will dismiss Defendant Van.

Liberally construed, Plaintiff has stated a threat-to-safety claim in Count Three against Defendants Keefe, Lopez, and Reyes based on Plaintiff's allegations that Keefe,

Lopez, and Reyes "briefed" Cal about Plaintiff's complaints regarding Cal's behavior. Liberally construed, Plaintiff has also stated a threat-to-safety claim in Count Three against Defendants Barraza and Westfall based on Plaintiff's allegations that Barraza and Westfall broadcast Plaintiff's statements that Cal had been stealing other prisoners' ice, despite knowing that other officers and prisoners could hear the radio transmission and that Cal had placed a "hit" on Plaintiff.  Finally, liberally construed, Plaintiff has stated a threat-to-safety claim in Count Three against Defendant Corral based on Plaintiff's allegations that Corral did not intervene when Cal punched Plaintiff.  The Court will require Defendants Keefe, Lopez, Reyes, Barraza, Westfall, and Corral to answer the relevant portions of Count Three.

**V.    Warnings**

    **A.    Address Changes**

Plaintiff must file and serve a notice of a change of address in accordance with Rule 83.3(d) of the Local Rules of Civil Procedure.  Plaintiff must not include a motion for other relief with a notice of change of address.  Failure to comply may result in dismissal of this action.

    **B.    Copies**

Plaintiff must serve Defendants, or counsel if an appearance has been entered, a copy of every document that he files.  Fed. R. Civ. P. 5(a).  Each filing must include a certificate stating that a copy of the filing was served.  Fed. R. Civ. P. 5(d).  Also, Plaintiff must submit an additional copy of every filing for use by the Court.  *See* LRCiv 5.4.  Failure to comply may result in the filing being stricken without further notice to Plaintiff.

    **C.    Possible Dismissal**

If Plaintiff fails to timely comply with every provision of this Order, including these warnings, the Court may dismiss this action without further notice.  *See Ferdik v. Bonzelet*, 963 F.2d 1258, 1260-61 (9th Cir. 1992) (a district court may dismiss an action for failure to comply with any order of the Court).

. . . .

**IT IS ORDERED:**

(1)     Plaintiff's Motion to Strike and Replace (Doc. 40) is **denied**.  The Clerk of Court **must not file** the proposed Fourth Amended Complaint lodged at Doc. 41.

(2)     Counts One and Two of the Fourth Amended Complaint (Doc. 39) are **dismissed** without prejudice.

(3)     Defendants Ryan, Shinn, Frame, Dayton, Ponzchoch, Van, Gorham, Brookheart, Garza, Erwin, Cromer, Olds, and Shute are **dismissed** without prejudice.

(4)     Defendants Keefe, Lopez, Reyes, Barraza, Westfall, and Corral must answer the relevant portions of Count Three.

(5)     The Clerk of Court must send Plaintiff a service packet including the Fourth Amended Complaint (Doc. 39), this Order, and both summons and request for waiver forms for Defendant Keefe, Lopez, Reyes, Barraza, Westfall, and Corral.

(6)     Plaintiff must complete[1] and return the service packet to the Clerk of Court within 21 days of the date of filing of this Order.  The United States Marshal will not provide service of process if Plaintiff fails to comply with this Order.

(7)     If Plaintiff does not either obtain a waiver of service of the summons or complete service of the Summons and Fourth Amended Complaint on a Defendant within 90 days of the filing of the Fourth Amended Complaint or within 60 days of the filing of this Order, whichever is later, the action may be dismissed as to each Defendant not served. Fed. R. Civ. P. 4(m); LRCiv 16.2(b)(2)(B)(ii).

(8)     The United States Marshal must retain the Summons, a copy of the Fourth Amended Complaint, and a copy of this Order for future use.

(9)     The United States Marshal must notify Defendants of the commencement of this action and request waiver of service of the summons pursuant to Rule 4(d) of the

---

[1] If a Defendant is an officer or employee of the Arizona Department of Corrections, Plaintiff must list the address of the specific institution where the officer or employee works.  Service cannot be effected on an officer or employee at the Central Office of the Arizona Department of Corrections unless the officer or employee works there.

1   Federal Rules of Civil Procedure.  The notice to Defendants must include a copy of this

2   Order.

3        (10)   A Defendant who agrees to waive service of the Summons and Fourth

4   Amended Complaint must return the signed waiver forms to the United States Marshal, not

5   the Plaintiff, **within 30 days of the date of the notice and request for waiver of service**

6   pursuant to Federal Rule of Civil Procedure 4(d)(1)(F) to avoid being charged the cost of

7   personal service.

8        (11)   The Marshal must immediately file signed waivers of service of the

9   summons.  If a waiver of service of summons is returned as undeliverable or is not returned

10  by a Defendant within 30 days from the date the request for waiver was sent by the Marshal,

11  the Marshal must:

12         (a)   personally serve copies of the Summons, Fourth Amended Complaint,

13  and this Order upon Defendant pursuant to Rule 4(e)(2) of the Federal Rules of Civil

14  Procedure; and

15         (b)   within 10 days after personal service is effected, file the return of

16  service for Defendant, along with evidence of the attempt to secure a waiver of

17  service of the summons and of the costs subsequently incurred in effecting service

18  upon Defendant.  The costs of service must be enumerated on the return of service

19  form (USM-285) and must include the costs incurred by the Marshal for

20  photocopying additional copies of the Summons, Fourth Amended Complaint, or

21  this Order and for preparing new process receipt and return forms (USM-285), if

22  required.  Costs of service will be taxed against the personally served Defendant

23  pursuant to Rule 4(d)(2) of the Federal Rules of Civil Procedure, unless otherwise

24  ordered by the Court.

25       (12)   Defendants Keefe, Lopez, Reyes, Barraza, Westfall, and Corral must answer

26  the relevant portions of the Fourth Amended Complaint or otherwise respond by

27  appropriate motion within the time provided by the applicable provisions of Rule 12(a) of

28  the Federal Rules of Civil Procedure.

**TERMPSREF**

(13)     Any answer or response must state the specific Defendant by name on whose behalf it is filed.  The Court may strike any answer, response, or other motion or paper that does not identify the specific Defendant by name on whose behalf it is filed.

(14)     This matter is referred to Magistrate Judge Michelle H. Burns pursuant to Rules 72.1 and 72.2 of the Local Rules of Civil Procedure for all pretrial proceedings as authorized under 28 U.S.C. § 636(b)(1).

Dated this 18th day of September, 2020.

James A. Teilborg
Senior United States District Judge

TERMPSREF

- 23 -